IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CYNTHIA KERNATS, TIFFANY GUY, MARION JOHNSON, and TENISHA MCCOY, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>COMCAST CORPORATION,<br><br>Defendant. | Case Nos. 09 C 3368 and 09 C 4305<br><br>Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Cynthia Kernats, Tiffany Guy, Marion Johnson, and Tenisha McCoy, individually and on behalf of all others similarly situated ("the Plaintiffs"), sued Defendant Comcast Corporation ("Comcast") alleging violations of the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*. ("IMWL"), for non-payment of all overtime wages (Count I) and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq*. ("IWPCA"), for non-payment of all straight-time wages (Count II). The Named Plaintiffs also individually allege violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., for non-payment of overtime wages (Count III). Pursuant to Federal Rule of Civil Procedure 23(b)(3), the Plaintiffs move to certify their state law claims (Counts I and II) as a class action. For the reasons stated below, the Court grants the Plaintiffs' Motion.

# BACKGROUND

The Plaintiffs work as hourly, non-exempt customer account representatives ("CAEs") in one of Comcast's eight Illinois customer service call centers. (R. 20, Am. Compl. ¶¶ 8-11; 21.)[1] In these eight Illinois call centers, Comcast employs approximately 2,300 CAEs. (Amend. Compl. ¶ 21; R. 23, Answer ¶ 21.) Although certain call centers address different types of customer issues, all CAEs share the same basic job description and primary duty—providing service and support to Comcast's customers and potential customers over the telephone—and all undergo similar training, work under common employment policies, and are subject to the same compensation scheme. (*See* Am. Compl. ¶ 17; R. 48, Pls' Class Cert. Mem. at 4.)

At the beginning of her shift, each CAE is required to log into her computer. (*See* Am. Compl. ¶ 2.) Comcast refers to this procedure as the "NT login"; the Court will refer to it as the "Initial Login." It is only after completing this Initial Login that a CAE can access and load the computer software applications she needs to take customer calls and, since 2008, to log into the telephone system itself.[2] (*See, e.g.*, Def. Appx. 27, Wright Dep. at 30:8-15; Def. Appx. 45,

---

[1] Comcast has operated four of the eight call centers—those located in Oak Brook, Schaumburg, Tinley Park, and Woodridge—throughout the class period. (Def. Appx. 34, Haubert Decl. ¶¶ 2-3.) Comcast acquired their other four Illinois call centers—those located in Champaign, Peoria, Rockford, and Springfield—in January of 2008. (*See* Haubert Decl. ¶ 3; Def. Appx. 15, Browning Dep. at 13:25-14:25; Def. Appx. 19, Holt Dep. at 4:18-22.)

Named Plaintiff Cynthia Kernats worked as an hourly, non-exempt CAE in Comcast's Woodridge call center between May of 2007 and May of 2008. (Answer ¶ 8.) Named Plaintiffs Tiffany Guy, Marion Johnson, and Tenisha McCoy have all worked as hourly, non-exempt CAEs in Comcast's Oakbrook call center since July 2008. (Answer ¶¶ 9-11; Pls' Ex. 9, Guy Dep. at 197:8-18; Pls' Ex. 21, Johnson Dep. at 17:24-19:12; Pls' Ex. 8, McCoy Dep. at 26:13-26:17.)

[2] Since 2008, Comcast has used the Cisco telephone system. (Haubert Dep. at 98:6-17.) To log into this system, a CAE types her assigned username, password, and extension into the Cisco computer application. (Def. Appx. 5 at COM00000190.) Before this time, Comcast used the Aspect telephone system, which did not require the use of a computer to sign into the system. (Haubert Dep. at 98:6-17.) Instead, a CAE would type her identification number into a physical telephone at her desk. (Green Decl. ¶ 6; Coleman Decl. ¶ 6; Wright Dep. at 51:1-52:12; Lahr Dep. at 100:21-25.)

2

Zandonai Decl ¶ 3; Def. Appx. 39, Lewis Decl. ¶ 4; Def. Appx. 33, Green Decl. ¶ 4; Def. Appx. 26, Niles Dep. at 64:5-65:8.) Specifically, before taking customer calls, CAEs are required to have the CSG billing system loaded on their computer because it contains needed customer information. (*See, e.g.*, Pls' Ex. 12, Goodman Dep. at 90:13-94:23; Pls' Ex. 4, Haubert Dep. at 101:7-10; Pls' Ex. 5, Holt Dep. at 55:5-25, 56:16-25.) Comcast also requires CAEs to perform non-phone activities, such as learning about new products, services, marketing campaigns, and other updates by reviewing company emails and accessing Comcast's "Casper" on-line reference tool. (*See, e.g.*, Pls' Ex. 10, Lahr Dep. at 185:16-19, 186:15-19; Holt Dep. at 57:4-17, 100:5.) CAEs are also required to review their individual performance reports on a daily basis. (Pls' Ex. 11, Coffman Dep. at 153:21-25; Pls' Ex. 5, Holt Dep. at 86:17-24.)

Throughout the class limitation period, Comcast's Oak Brook, Tinley Park, Schaumburg, and Woodridge call centers have used the following metrics to evaluate CAE productivity: Sign On Time; Customer Availability; Average Handle Time; Comcast Quality Experience; Sales Upgrade Rate; and Work Order Accuracy. (Haubert Decl. ¶ 8; Def. Appx. 7, 2007 Billing/Service Goals.) The other four call centers began using the metric system in August of 2009. (*See* Holt Dep. at 44:10-45:2.) The Sign On Time metric measures the percentage of the CAE's scheduled shift that she is logged into the telephone system. (Def. Appx. 7, 2007 Billing/Service Goals.) CAEs must maintain a Sign On Time of 96% to avoid being placed into the "Improvement Required" category, but to be labeled as a "Strong Performance Achiever," a CAE must maintain a Sign On Time of 98%. (Def. Appx. 7, 2007 Billing/Service Goals.) Customer Availability, in turn, measures the percentage of total Sign On Time that the CAE is available to take customer calls. (Def. Appx. 7, 2007 Billing/Service Goals.) To avoid being placed into the "Improvement Required category,

3

CAEs must maintain a Customer Availability of 90%. (Def. Appx. 7, 2007 Billing/Service Goals.) To be a "Strong Performance Achiever," however, CAEs must maintain a Customer Availability of 92.5% or more. (Def. Appx. 7, 2007 Billing/Service Goals.)

Comcast has also used three different methods of CAE timekeeping during the limitations period: the Manual System, the Automated System, and Employee Self Service ("ESS"). (Lahr Dep. 84:15-21.) Under the Manual System, CAEs completed handwritten timesheets, rounding their time to the nearest quarter-hour. (Def. Appx. 8 at P0273-274.) Under the Automated System, used in the Oak Brook, Woodridge, Tinley Park, and Schaumburg call centers between 2006 and December 13, 2008, timesheets were generated from CAE's phone logins—not the Initial Login. (*See, e.g.*, Lahr Dep. at 98:19-99:5; Holt Dep. at 39:24-41:24; Haubert Dep. at 42:1-5.) Comcast personnel adjusted the phone login times based on any exceptions, and then rounded those times to the nearest quarter-hour for pay purposes. (Haubert Decl. ¶ 6.) Since December 14, 2008, Comcast has used ESS in all of its eight call centers. (Haubert Dep. at 42:1-5.) ESS is a computerized timesheet that requires CAEs to manually report their own time. The timesheets are audited by the CAE's supervisor by comparing the timesheets to the CAE's work schedules, exceptions, and the telephone login reports. (Haubert Dep. at 163:14-164:19.)

The Plaintiffs allege that Comcast failed to pay them and other similarly situated CAEs for all work performed, including overtime wages, in violation of Illinois wage and hour laws. (Am. Compl. ¶ 16.) Specifically, the Plaintiffs allege that Comcast required or knowingly permitted CAEs to perform unpaid work after their Initial Login, but before their scheduled start time, including booting-up their computers and initializing essential software programs. (Am. Compl. ¶ 18; Pls'

Class Cert. Mem. at 1.) The Plaintiffs allege that this Initial Login to the computer system is the first principal activity of each CAE's day. (Pls' Reply at 8.)

The Plaintiffs contend that as a result of working this uncompensated time, they and other similarly-situated CAEs accrue time over forty hours in the workweek, for which they are not compensated at an overtime rate. (Am. Compl. ¶ 4.) To the extent that any uncompensated off-the-clock work by CAEs was straight-time hours, rather than overtime, the Plaintiffs also allege that Comcast violated the IWPCA. (Am. Compl. ¶¶ 41-46.) The Plaintiffs seek to certify two classes, one as to their IMWL claim and one as to their IWPCA claim. The Plaintiffs' proposed definition for the IMWL class is:

> All persons employed as Customer Account Executives in Illinois by Defendant Comcast Corporation from June 3, 2006, to the conclusion of this action who worked in excess of forty (40) hours in any individual workweek, and who were not paid for all overtime worked at the rate of one and one-half times their regular rate of pay.

(Pls' Class Cert. Mem. at 13.) The Plaintiffs' proposed definition for the IWPCA class is:

> All persons employed as Customer Account Executives in Illinois by Defendant Comcast Corporation from August 17, 2002, to the conclusion of this action who were not paid for all time worked in individual workweeks.

(Pls' Class Cert. Mem. at 13.)

During the limited class discovery, Comcast produced electronic records that identified CAE Initial Login times and scheduled start times. Specifically, Comcast produced 2,895,897 records relating to the Initial Login and scheduled start times of 7,933 CAEs for the period of April 26, 2005 through January 18, 2010. (*See* Pls' Ex. 3, Madansky Report ¶ 3.) Although no usable data is available for over 60% of the CAEs, the Plaintiffs' expert, Professor Albert Madansky's identified 355,265 records from 3,192 CAEs in which he could determine both the Initial Login time and the

5

CAE's scheduled start time. (Madansky Report ¶¶ 3, 5.) According to Madansky, for these 3,192, the data demonstrates that the average difference between the CAEs' Initial Login and their scheduled start time is 11.4 minutes. (Madansky Report ¶ 7.) The parties also exchanged written discovery, secured declarations from class representatives, took a number of depositions.

## STANDARD OF REVIEW

The Court has broad discretion to resolve whether certifying a class is proper under Federal Rule of Civil Procedure 23. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). In making this determination, the Court takes the substantive allegations in the complaint as true and, generally, does not examine the ultimate merits of the case. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981). Before deciding whether a case should proceed as a class action, however, the Court should "make whatever factual and legal inquiries are necessary under Rule 23." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). The Plaintiffs bear the burden of demonstrating that their case meets all of the requirements of Rule 23. *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000).

A party seeking to certify a class action must first show that the putative class satisfies the four threshold requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). If the party meets this initial burden, it must then show that the requirements for one of the subsections of Rule 23(b) are met. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Here, the Plaintiffs seek certification under Rule 23(b)(3), which requires the Plaintiffs to demonstrate that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the

controversy. In addition to the Rule 23 requirements, the party seeking class certification must also provide a workable class definition by showing that the members of the class are identifiable. *See Oshana*, 472 F.3d at 513.

## DISCUSSION

I.  **Rule 23(a) Requirements**

The Plaintiffs contend that their IMWL and IWPCA claims against Comcast satisfy the four threshold requirements of Rule 23(a). Comcast does not dispute that the Plaintiffs' claims meet the requirements of numerosity and adequacy of representation. Comcast argues instead that the Plaintiffs cannot establish commonality and typicality.

To meet the commonality requirement in Rule 23(a), a plaintiff must show that questions of law or fact common to the class exist. Fed. R. Civ. P. 23(a)(2). This requires that the claims of the Named Plaintiffs and those of the class arise from "[a] common nucleus of operative fact," and is satisfied where the defendant has "engaged in standardized conduct towards members of the proposed class . . . ." *Keele*, 149 F.3d at 594. In other words, a plaintiff satisfies the commonality requirement if he can show that "the class members' claims hinge on the same conduct of the defendants." *Ross v. RBS Citizens, N.A.*, No. 09 C 5695, 2010 WL 3980113, at *3 (N.D. Ill. Oct. 8, 2010) (Lefkow, J.). Similarly, typicality requires a showing that the Named Plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De la Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citation omitted). A plaintiff can satisfy the typicality requirement "even if there are factual distinctions between the claims of the named

7

plaintiffs and those of other class members." *Id*. Accordingly, "similarity of legal theory may control even in the face of differences of fact." *Id*.

Here, because the Plaintiffs allege that members of the putative classes are subject to standardized conduct by Comcast and because the Named Plaintiffs' IMWL and IWPCA claims arise from the same practice that gives rise to the claims of other class members, the Plaintiffs meet the requirements of commonality and typicality. Specifically, the Plaintiffs allege that the members of the putative classes are subject to Comcast's practice of failing to compensate CAEs for all time worked. According to the Plaintiffs, Comcast has a company-wide practice, applicable to all members of both putative classes, that permitted CAEs to work without compensation after their Initial Login but before the start of their scheduled shifts.

Comcast argues that the Plaintiffs cannot meet either requirement because Plaintiffs cannot prove that members of the putative classes are subject to a written Comcast policy supporting their allegations. In fact, Comcast argues, its written policies make clear that CAEs are not expected to work before their scheduled start time. (*See, e.g.*, R. 55, Def. Appx. 1 at COM00003516 ("Employees are expected to be at work, be ready to begin working at their scheduled start time . . . .").) Further, Comcast contends, its written policies emphasize that if CAEs do begin working prior to their scheduled start time, they should record any pre-shift work for pay purposes. (*See, e.g.*, Def. Appx. 1 at COM00003564, Def. Appx. 1 at COM00003623.) Finally, Comcast points to the fact that its employees are periodically reminded of this requirement and are told to report any violations of its timekeeping policies to Human Resources. (*See, e.g.*, Def. Appx. 6 at COM000012670; Def. Appx. 10 at P211; Def. Appx. 1 at COM00003623; Def. Appx. 1 at COM00003554.) In the face of these formal policies that apply to all members of the putative class,

Comcast argues, the Plaintiffs cannot show that the class members' claims arise from Comcast's standardized course of conduct.

The Plaintiffs do not dispute that the formal, written policies cited by Comcast exist. They have instead alleged that despite these policies, CAEs were subject to a company-wide practice that encouraged, or, at the very least, permitted, CAEs to log into their computers before their scheduled start time without compensating them for that time. *See, e.g.*, *Russell v. Illinois Bell Telephone Co., Inc.*, — F. Supp. 2d —, No. 08 C 1871, 2010 WL 2595234, at *9 (N.D. Ill. June 28, 2010) (Kennelly, J.) (in the FLSA context, "lawful written (or verbal) policies will not shield the company from liability if plaintiffs can show other company-wide practices that may have been contrary to those policies and violated the FLSA"). For support, the Plaintiffs point to an email from Donna C. Thacker ("Thacker") to certain call center managers, in which Thacker asks the recipients to communicate to the CAEs at their call centers that they are not allowed to complete their Initial Login until the scheduled start time. (Pls' Ex. 20 at COM00003655.) According to the email, while Thacker realized that "it does take the computers a while to boot up" and that "this may create a few issues of instant availability of the CAEs," she concluded that this "is the best process." (Pls' Ex. 20 at COM00003655.) The Plaintiffs assert that this email suggests that there was an unwritten, company-wide practice of allowing Plaintiffs to perform uncompensated work before their scheduled start time.

The Plaintiffs also argue that Madansky's data analysis, while limited, demonstrates that a significant number of CAEs were completing their Initial Login before their scheduled start time. (Pls' Ex. 3 at 1-2.) At the very least, the Plaintiffs argue, this data demonstrates that Comcast's written policy "can only have been honored in the breach." (Pl's Reply at 5.) Finally, the Plaintiffs

9

point to Comcast's metric system—a systematic practice by Comcast applicable to most putative class members until 2009 and all putative class members since. The Plaintiffs argue that the metric system encourages CAEs to perform uncompensated work outside their scheduled work hours. According to the Plaintiffs, to meet their billing and service goals and also perform other tasks required for their position, such as loading necessary computer applications, reviewing their company emails and any changes in policy, and calling customers back, it was necessary for CAEs to either arrive early and complete their Initial Login or to perform these tasks during what were supposed to be scheduled breaks.

The Plaintiffs' allegations of standardized conduct on the part of Comcast are enough to meet the relatively low hurdle of proving commonality. *See, e.g.*, *Driver v. AppleIllinois, LLC*, 265 F.R.D. 293, 303 (N.D. Ill. 2010) (quoting *Smith v. Aon Corp.*, 238 F.R.D. 609, 614 (N.D. Ill. 2006)) ("The commonality requirement is not difficult to meet."); *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill 1992) ("[T]he commonality requirement has been characterized as a 'low hurdle' easily surmounted."); *Ross*, 2010 WL 3980113, at *3 (same). The claims of the putative classes hinge on the same conduct of Comcast: specifically, Comcast's failure to pay members of the class for work done after completion of their Initial Login, but before their scheduled start time. The allegation of a policy or practice applicable to a class of employees is enough to establish a common question of law or fact. *See, e.g.*, *Ross*, 2010 WL 3980113, at *3 (finding that the plaintiffs' proposed class met the commonality requirement).

Similarly, the Named Plaintiffs' claims in this case are sufficiently typical of the claims of the class as a whole to satisfy the typicality requirement, also a relatively low hurdle. *See, e.g.*, *Owner-Operator Independent Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282

(N.D. Ill. 2005) (calling Rule 23(a)(3) a "low hurdle" that "requires neither complete coextensivity nor even identity of claims"). The Named Plaintiffs' claims rest on the theory that CAE's Initial Login is the first principal activity of their day and that all work done after the Initial Login is compensable work. According to the Named Plaintiffs, Comcast had a company-wide practice of not paying CAEs for work performed between this Initial Login and their scheduled start time. The Plaintiffs' allegations suggest that this practice affected CAEs at all of Comcast's Illinois call centers throughout the limitations period. While there may be factual differences between claims of the Named Plaintiffs and those of other class members, their claims are nevertheless based on the same legal theory. *De La Fuente*, 713 F.2d at 232 ("[S]imilarity of legal theory may control even in the face of differences of fact."). The Plaintiffs thus satisfy the typicality requirement.

For those reasons, the Court finds that the Plaintiffs have met the threshold requirements of Rule 23(a).

**II.     Rule 23(b)(3)**

Having concluded that the putative class meets the requirements of Rule 23(a), the Court now turns to the requirements of Rule 23(b)(3). As discussed above, to meet this requirement, the Plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (plaintiff must satisfy at least one of the categories under Rule 23(b)). Classes brought under Rule 23(b)(3) are those "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other

undesirable results." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citation omitted).

    **A.    Predominance**

Although it is related to the commonality requirement of Rule 23(a), the predominance requirement is far more demanding. *See Amchem Prod., Inc.*, 521 U.S. at 623-24. It tests whether a proposed class is "sufficiently cohesive" to warrant adjudication as a class. *See id*. at 623. To satisfy this inquiry, a plaintiff must show that common issues not only exist, but that they outweigh any questions affecting only individual members. *See, e.g.*, *Ross*, 2010 WL 3980113, at *6; *Driver*, 265 F.R.D. at 303; *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 831, 837-838 (N.D. Ill. 2008). Thus, the Plaintiffs bear the burden of demonstrating "that the elements of liability are capable of proof at trial through evidence that is common to the class rather than individual to the members." *Driver*, 265 F.R.D. at 303; *see also Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981) (the predominance inquiry is a two step process, focusing first "on the substantive elements of plaintiffs' cause of action and . . . the proof necessary for the various elements" and then on "the form that trial on these issues would take").

To establish liability under the IMWL, the Plaintiffs would have to prove that: (1) members of the putative class performed work before the start of their shift; (2) Comcast required or permitted that work to be performed; (3) they worked for more than forty hours during the week that the alleged pre-shift work was performed; and (4) they were not paid at one and one-half times their regular hourly rate for that work. *See* 820 ILCS 105/4a(1). With respect to their IWPCA claim, the Plaintiffs would have to prove (1) members of the putative class performed work before the start of

their shifts; (2) Comcast required or permitted that work to be performed; (3) they were not paid for that work. *See* 820 ILCS 115/3.

Here, the amount of evidence required to prove liability on both claims that is common to all putative class members outweighs the evidence individual to each class member. First, as discussed in the Court's analysis in Section I, although Comcast has a formal policy stating that all hours worked will be compensated, the Plaintiffs have alleged that an unofficial, company-wide practice exists that denies putative class members overtime or compensation for time worked. The Court concludes that the proof the Plaintiffs have offered is enough to infer that the common issue of whether a company-wide practice exists to deny overtime or compensation will predominate over the variations in methods used to accomplish the alleged policy, such as engaging in a supervisor-by-supervisor analysis to determine the source of the alleged requirement. *See, e.g.*, *Ross*, 2010 WL 3980113 (concluding, despite the defendants' argument "that determining whether overtime was denied would require individualized, or at least branch by branch, manager by manager, determinations," that the plaintiff met the predominance requirement).

Second, unlike the cases relied on by Comcast, the Plaintiffs in this case allege that the CAE's Initial Login is the first principal activity of a CAE's workday. Pursuant to the continuous workday rule, Plaintiffs argue, any activity completed after the first principal activity of the day—including anything undertaken before the CAE's scheduled start time—is compensable. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 28-29 (2005); 29 C.F.R. § 790.6(a) ("Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked . . . ."). This is a threshold legal issue common to each class members' claims that outweighs any individualized

13

inquiry into whether CAEs were actually working during the time between their Initial Login and their scheduled start time.

Third, the Plaintiffs' data evidence, along with the Thacker email, is enough to demonstrate that a class-wide analysis as to whether Comcast had actual or constructive knowledge of class members' uncompensated work activity outweighs any individualized inquiry into whether each CAE's supervisor knew that the CAE was completing her Initial Login before her scheduled start time. The fact that Thacker sent the email supervisors at a number of Comcast's call centers suggests that supervisors throughout the company may have had knowledge of early Initial Logins. Finally, while potential class members were subject to three different timekeeping systems and two different telephone systems during the class period, and determination of whether alleged pre-shift work went unpaid may require a separate analysis depending on the system in place, "[w]hen a proposed class challenges a uniform policy, the validity of that policy tends to be the predominant issue in the litigation." *Streeter v. Sheriff of Cook County*, 256 F.R.D. 609, 614 (N.D. Ill. 2009). Here, the common threshold issues relating to liability—whether Comcast had an informal practice of permitting its CAEs to perform uncompensated work after the first principal activity of their day—outweigh any individual questions.

    **B.**    **Superiority**

The second requirement for class certification under Rule 23(b)(3) is "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here, there are a large number of potential class members each with the same claim under the same two statutes and each potentially entitled to a relatively small recovery. Deciding each claim separately would be an inefficient use of both judicial and party resources and because

of the small individual recovery, many potential plaintiffs may not even bring their claims. This situation makes the Plaintiffs' claims ideal for resolution as a class action. *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("Rule 23(b)(3) was designed for situations . . . in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate"). Thus, the Court concludes that the resolution of these issues on a class-wide basis is superior to allowing repetitive individual suits. *See, e.g., Ross*, 2010 WL 3980113, at *8 (resolution of IMWL case as class action superior and "promotes judicial economy and efficiency and consistency of judgments").

For those reasons, the Plaintiffs' IMWL and IWPCA claims satisfy the requirements of Rule 23(b)(3).

**CONCLUSION AND ORDER**

Because the Plaintiffs have satisfied the required elements of Rule 23(a) and Rule 23(b)93), the Court grants their Motion for Class Certification. The IMWL class is defined as: All persons employed as Customer Account Executives in Illinois by Defendant Comcast Corporation from June 3, 2006, to the conclusion of this action who worked in excess of forty (40) hours in any individual workweek, and who were not paid for all overtime worked at the rate of one and one-half times their regular rate of pay. The IWPCA class is defined as: All persons employed as Customer Account Executives in Illinois by Defendant Comcast Corporation from August 17, 2002, to the conclusion of this action who were not paid for all time worked in individual workweeks. The Court authorizes notice to issue to putative class members at the Plaintiffs' expense, and appoints counsel for the Named Plaintiffs as class counsel for both classes.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: October 20, 2010